**In re Mary Lee WHITTAKER, Debtor.**

**Mary Lee WHITTAKER, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**The PHILADELPHIA ELECTRIC COMPANY, Defendant.**

**Bankruptcy No. 87–05436S.**
**Adv. No. 87–0939S.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 6, 1988.

Michael Donahue, Community Legal Services, Philadelphia, Pa., for debtor.

James P. Cousounis, Philadelphia, Pa., for defendant.

Anthony Barone, Philadelphia, Pa., trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

One of the genuine tragedies of contemporary America is that many low-income citizens have insufficient financial resources to pay for utility services which have become veritable necessities of life. The instant adversary proceeding is brought by such a low-income citizen, and we are prepared to grant her certain relief against the Defendant utility.

We hold herein that the utility violated 11 U.S.C. § 366(a) when it refused to restore the service of a customer, which has been terminated pre-petition, upon request and without the pre-payment of a deposit as adequate assurance of future payment. We base our decision on two alternative bases: (1) Such policies constitute a refusal to provide services solely because of nonpayment of a pre-payment debt; and (2) Such policies constitute discrimination, in light of the Defendant's policy of not re-

quiring deposits from any new non-debtor residential customers or from non-debtor residential customers who seek to restore previously-terminated services. We therefore hold that, reading both sections of § 366 together, a utility customer-debtor is unconditionally entitled, upon request, to service until twenty (20) days after a bankruptcy filing without providing an adequate assurance payment, irrespective of whether the customer's service had been terminated pre-petition or not. We balance this holding by rejecting an alternative claim of the Debtor that an unaccepted offer of adequate protection extends that twenty (20)–day period.

Procedurally, we hold that the Debtor here is entitled to maintain this proceeding, under Bankruptcy Rule (hereinafter referred to as "B.Rule") 7023 and Federal Rule of Civil Procedure (hereinafter referred to as "F.R.Civ.P.") 23(b), as a class action seeking declaratory and injunctive relief only for unnamed class members. Finally, we hold that damages of twenty ($20.00) dollars are recoverable by the Debtor only.

### B. PROCEDURAL HISTORY

The Debtor filed her underlying Chapter 7 bankruptcy case on October 29, 1987, at which time her electric service had been terminated for two weeks. Almost immediately thereafter, on November 2, 1987, she filed the instant class action Complaint, a Motion for class certification, and a request for an expedited preliminary injunction hearing in this adversary proceeding. In the preliminary injunction motion, set down by us for a hearing on November 5, 1987, the Debtor and named Plaintiff, MARY LEE WHITTAKER,[1] requested that this court direct that the Defendant, PHILADELPHIA ELECTRIC CO., to accept her payment of adequate assurance in installments, or alternatively, remittances from a crisis energy grant to allow immediate restoration of the Debtor's electric service. In its typical spirit of cooperation, the Defend-

ant agreed to the relief requested without the necessity of the November 5, 1987, hearing, and service was immediately restored to the Debtor pending our approval of a written stipulation between the parties embodying this agreement, which we executed on December 3, 1987.

Meanwhile, hearings on both the merits of the Complaint and the class certification motion were continued from December, 1987, to, ultimately, February 3, 1988. On the latter date, we heard testimony from the Debtor and witnesses on behalf of the Defendant, the most prominent of whom was George Bastian, the Defendant's manager of credit services. This testimony and responses to certain interrogatories served upon the Defendant resulted in the establishment of a record of largely undisputed facts. At the close of the hearing, we indicated our intention to establish the briefing schedule set forth in an Order of February 4, 1988. The Defendant requested and obtained extensions which amounted to sixteen (16) days and resulted in delay in completion of the briefing until March 25, 1988. Although most of the underlying facts are undisputed, B.Rule 7052, incorporating F.R.Civ.P. 52(a), requires that we submit our decision in the form of Findings of Fact, Conclusions of Law, and a Discussion.

### C. FINDINGS OF FACT

1. The Debtor and named Plaintiff in this proceeding is a middle-aged, partially deaf matriarch who resides with her daughter, on occasion one or more of her sons, and four grandchildren of her daughter, in a scattered public housing unit located at 1955 North 31st Street, Philadelphia, Pennsylvania, which is serviced for electricity exclusively by the Defendant.

2. On October 15, 1987, the Defendant terminated service to the Debtor's home solely because of her nonpayment of bills for electric service totaling $1,594.97.

3. At the time of service termination, the Defendant informed the Debtor that

---

**1.** The Debtor's name was originally erroneously spelled in the main case and in this proceeding as "WHITAKER."

she would have to pay $200.00 on her arrearages together with a $20.00 reconnection charge to regain service, although the $200.00 sum was later adjusted through mediation by the Pennsylvania Public Utility Commission (hereinafter referred to as "PUC"), which regulates the Defendant, to the sum of $150.00.

4. The day after filing her petition for relief on October 29, 1987, the Debtor walked the considerable distance from her home to the office of her legal-aid counsel, where she received a copy of her petition, which she then walked another considerable distance to the Defendant's office.

5. She was waited on in the Defendant's office by Bruce Weaver, a service representative who testified, without dispute, that he informed her that she would have to make an adequate assurance payment of $140.00, computed from her average monthly usage of $72.00, together with a reconnection charge of $20.00, as a condition to restore her service.

6. The Debtor did not have the $160.00 requested by the Defendant. She immediately reported her plight to her counsel, who called an agent of the Defendant on that same day and requested that the Debtor's service be restored pursuant to a payment schedule by which the Debtor would pay $80.00 in November, 1987; and $40.00 in both December, 1987, and January, 1988.

7. This offer was refused, although the Debtor's service was restored on November 5, 1988, after she instituted this action, as described at page 936 *supra*.

8. The Debtor suffered certain substantial inconveniences due to lack of electricity to operate her refrigerator and lights, as well as any other electrical appliances, between October 30, 1987, and November 5, 1987.

9. The Defendant, per Mr. Bastian, indicated that its policy as to customers filing bankruptcy whose service has been terminated prepetition, is to demand, as a condition of restoration of service, that the debtor-customer post the entire adequate assurance of payment in the form of a lump-sum cash payment, and to not restore service until the entire sum is paid.

10. The Defendant's policy regarding customers whose service has been terminated but who have not filed bankruptcy and wish to have service restored is not to demand payment of any security deposit as a condition for restoration of service, but to require that the customer satisfy the entire indebtedness owing to the Defendant prior to restoration of service.

11. However, Mr. Bastian further testified that the Defendant tempers the policy set forth in Finding of Fact 10 by allowing a non-debtor whose service is terminated and wishes services to be restored to pay "even a small amount in order to have that service restored, provided that ... they can pay something plus keep their bill current" if the customer "doesn't have the ability to pay." No such dispensation is allowed to a debtor whose service is terminated.

12. In Answers to Interrogatories, the Defendant averred that, while it has authority from the PUC to do so, it does not in fact ever request non-debtor residential customers to pay a deposit as a condition for receipt of service.

13. The Defendant's policy, upon receipt of an offer of adequate protection, is to restore service only if that offer is acceptable to it or unless it is ordered to do so by the court.

14. Mr. Bastian reported that, according to the Defendant's records compiled at his request, sixty-four (64) parties whose service had been terminated for non-payment had thereafter filed for bankruptcy in 1987.

## D. CONCLUSIONS OF LAW

1. The Debtor is entitled to maintain this action as a class action, for injunctive and declaratory relief only, pursuant to B.Rule 7023 and F.R.Civ.P. 23(b)(2), on behalf of all debtors who are residential customers of the Defendant and who have had their utility service terminated solely due to non-payment of pre-petition bills as of the time of their filing bankruptcy.

2. The Defendant's policy of demanding a full adequate assurance payment from

members of the plaintiff class as a condition for restoring utility service to such parties despite their request for immediate restoration in the 20–day period after filing is violative of 11 U.S.C. § 366(a), as it constitutes both a proscribed refusal to provide services to debtors and an equally prohibited discrimination as to debtors.

3. The Defendant's policy of refusing to provide service until an offer of adequate protection acceptable to it is made or a court orders it to do so, once the 20–day period after filing expires, is not violative of 11 U.S.C. § 366(b).

4. The Debtor is entitled to monetary damages of $20.00 and declaratory and injunctive relief on behalf of her class prohibiting the practice described in Conclusion of Law 2 *supra*. No other relief is warranted.

## D. DISCUSSION

1. THE DEBTOR IS ENTITLED TO MAINTAIN THIS ACTION, PURSUANT TO RULE 7023 AND F.R.CIV.P. 23(b), AS A CLASS ACTION SEEKING ONLY DECLARATORY AND INJUNCTIVE RELIEF AS TO UNNAMED CLASS MEMBERS.

■ The Debtor seeks to maintain this action on behalf of a class which she defined, in her Complaint, as follows:

all individuals who:

(a) are residential customers of the Philadelphia Electric Company;

(b) have filed or will file a Voluntary Petition for Relief pursuant to Chapter 7 or Chapter 13 of Title 11 of the United States Code; and

(c) have had their utility service to their residence terminated at the time of the filing of the Voluntary Petition.

Class Action Complaint, ¶ 9.

It is clear that the Debtor invokes and attempts to maintain this action to obtain declaratory and injunctive relief for unnamed class members, pursuant to F.R.Civ. P. 23(b)(2), incorporated into bankruptcy adversary proceedings by B.Rule 7023, which provides as follows:

Rule 23. Class Actions

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition

. . . . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; ...

Less clear, as the Defendant points out, was whether the Debtor also sought monetary relief for any unnamed class members. Clearly, it is possible to obtain monetary relief for unnamed class members in a Rule 23(b)(2) class action. *See Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 250–53, (3d Cir.1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); and 3B J. MOORE, FEDERAL PRACTICE, ¶ 23.40[4], at 23–278 to 23–283 (2d ed. 1987). *Compare In re Fleet*, 76 B.R. 1001, 1010–11 (Bankr.E.D.Pa.1987) (suit requesting *primarily* monetary damages for unnamed class members must be maintained pursuant to F.R.Civ.P. 23(b)(3)).

We note, however, that the debtor has not undertaken to prove any damages as to any unnamed class members, and has not made any request for us to hold the record open for it to do so. Further, in her Reply Brief, she indicated that she did not seek monetary damages for unnamed class members. Therefore, as in *In re Watts*, 76 B.R. 390, 396 (Bankr.E.D.Pa.1987), where it also appeared that no monetary damages were sought for unnamed class members and proof of damages was lacking, *see id.*

at 409, we hold that the Debtor, as the named plaintiff, cannot recover monetary damages on behalf of unnamed class members but is authorized to recover only declaratory and injunctive relief on their behalf.

Much of the opposition of the Defendant to class certification appears to arise from its uncertainty as to the Debtor's request for monetary damages for unnamed class members, and may well evaporate in light of our ruling that only declaratory and injunctive relief can be recovered by unnamed class members. However, the Defendant did file a quite lengthy Memorandum of Law opposing class certification on January 22, 1988, prior to the hearing on February 4, 1988.

In that Memorandum, the Defendant contended that the Debtor had failed to meet the numerosity requirement of F.R.Civ.P. 23(a)(1) because she had failed to at least estimate the number of class members and had failed to meet the adequacy of representation requirement of F.R.Civ.P. 23(a)(4) because, having had her service restored, she was allegedly no longer able to adequately represent the putative class.

■ We believe that neither of these articulated objections has merit. First, with respect to numerosity, a record was made at the hearing that sixty-four (64) debtors filing Chapter 7 or Chapter 13 bankruptcies in 1987 met the class definition recited at page 938 *supra.* Moreover, as the class includes similarly-situated debtors who may materialize in the future, the number of potential class members is constantly increasing beyond that figure. In *Watts, supra,* 76 B.R. at 397–98, we held that sixteen (16) identifiable class members and the "continuously evolving nature of the class" due to future expansion met the 23(a)(1) numerosity requirement. This holding is controlling here, because, as in *Watts,* only declaratory and injunctive relief is in issue and, in such circumstances, "even speculative, conclusory representations as to size of the class suffice." *Id.* at 398 (citing *Doe v. Flowers,* 364 F.Supp. 953, 954 (N.D.W.Va.1983) (three-judge court),

*aff'd,* 416 U.S. 922, 94 S.Ct. 1921, 40 L.Ed. 2d 279 (1974)).

■ As we indicated in both *Fleet, supra,* 76 B.R. 1009–10, and *Watts, supra,* 76 B.R. at 400, the 23(a)(4) requirement consists of two elements: (1) Ability of the class representative's counsel to conduct the litigation; and (2) Lack of antagonistic interests between the named representatives and the class members sought to be represented. *See also Wetzel, supra,* 508 F.2d at 247. The Defendant does not contest the presence of the first prong of this test, but contends that the passage of the critical twenty (20)–day post-filing period as to the Debtor and the restoration of her service by stipulation of the parties in the course of this litigation has rendered her controversy moot and has resulted in her status being such that she no longer shares the interests of other class members.

We disagree that the mootness of the Debtor's claim, through either the passage of time or her success in obtaining provisional relief in this very litigation, would render her interests antagonistic to that of other class members. First, there is no allegation that the Debtor's present status creates any tension between herself and other class members. Secondly, the sad truth is that the same scenario could play out again, six (6) years hence, as to this very Debtor. Hence, the resolution of her immediate problem does not render concern with the issue of the rights of debtors whose service was terminated pre-petition to obtain immediate restoration of service of no possible pertinency to the Debtor in the future. Thirdly, even if the same scenario could not pay out with respect to this particular Debtor, there is authority that this factor does not render her an inappropriate class representative. *See, e.g., Conover v. Montemuro,* 477 F.2d 1073, 1081–82 (3d Cir.1973); *Wymelenberg v. Syman,* 54 F.R.D. 198, 200 (E.D.Wis.1972) (three-judge court); and 3B J. MOORE, *supra,* ¶ 23.07[3], at 23–216 to 23–219.

The substance of the Defendant's argument appears to be that the Debtor lacks standing to maintain this action, as she is no longer a member of the putative class.

However, here, because the twenty-day period runs so rapidly, we are faced with a controversy which is capable of repetition, yet could evade review. In such an instance, class certification should not be barred even if the class representative's claim becomes moot by the passage of time. *See Gerstein v. Pugh*, 420 U.S. 103, 110–11 n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975); and *Sosna v. Iowa*, 419 U.S. 393, 397–403, 95 S.Ct. 553, 556–59, 42 L.Ed.2d 532 (1975). As in *Gerstein*, we note that the Debtor's counsel is a publicly-funded legal-assistance organization which we can safely assume will have other clients with a continuing live interest in this case. 420 U.S. at 111 n. 11, 95 S.Ct. at 861 n. 11. Finally, a live controversy, precluding a finding of mootness, exists between the parties relative to the substantive issues in question in light of the Debtor's modest but viable damage claim. The presence of such a claim renders her an appropriate class representative even if the matter were not capable of repetition, yet evading review. *See Franks v. Bowman Transportation Co.*, 424 U.S. 747, 752–57, 96 S.Ct. 1251, 1258–61, 47 L.Ed.2d 444 (1976).

Therefore, we conclude, without hesitation, that the Debtor may maintain this proceeding as a class action seeking only declaratory and injunctive relief for the unnamed class members, pursuant to F.R. Civ.P. 23(b)(2). We shall, however, re-word the Debtor's proffered class definition as follows: all individual debtors who have had their residential electric service terminated solely for non-payment of past services by the Philadelphia Electric Company prior to filing bankruptcy in the past, or who may be so situated in the future.

## 2. A DESCRIPTION OF THE DEBTOR'S SUBSTANTIVE ARGUMENTS

The substance of the Debtor's claims are based upon 11 U.S.C. § 366 which reads as follows:

§ 366. Utility Service.

(a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

We perceive the Debtor to mount three discrete arguments that the Defendant's policies violate 11 U.S.C. § 366(a) with respect to members of the class as defined at page 940 *supra* (herein referred to as "the Plaintiffs"): (1) The Defendant's refusal to provide service upon filing is *per se* violative of § 366(a), irrespective of the substance of its policy for requiring adequate assurance; (2) Assuming *arguendo* that the first argument is rejected, the Defendant's instant policy is discriminatory as to the Plaintiffs, because they are required to make an adequate assurance payment even though no payment is required by the Defendant from either new residential customers or from non-debtors who seek to restore terminated service; and (3) Assuming *arguendo* that both of the first two arguments are rejected, the Defendant's policy of refusing the Plaintiffs an opportunity to tender the adequate assurance payment in installments is violative of applicable PUC Regulations, particularly 52 PA. CODE § 55.38 and 56.42.

We believe that both of the Debtor's first two arguments are meritorious. Although our holding as to the first argument would be dispositive of the matter in itself, we are reluctant to rely solely upon this basis because of an arguable difference between our result and that reached by our district court in *In re Roberts*, 29 B.R. 808 (Bankr. E.D.Pa.1983, and our esteemed brethren, Judge Fox, in *In re Kiriluk*, 76 B.R. 979

(Bankr.E.D.Pa.1987); and former Chief Judge Goldhaber in *Roberts*, 27 B.R. 101 (Bankr.E.D.Pa.1983). However, since our holding as to the second argument is totally consistent with the above decisions, and we think rather indisputably clear, we deem it unnecessary to reach the third argument.

3. THE DEFENDANT'S POLICY OF REQUIRING AN ADEQUATE ASSURANCE PAYMENT FROM DEBTORS TO RESTORE UTILITY SERVICE WHICH HAS BEEN TERMINATED PRE–PETITION SOLELY FOR NON–PAYMENT OF CHARGES FOR PAST SERVICES IS VIOLATIVE OF 11 U.S.C. § 366(a).

■ Acceptance of the first argument made by the Debtor requires only that we reach the result which the language of § 366(a) literally requires. The statute states, quite plainly, that a utility may not "refuse ... *or* discriminate" against a debtor solely on the basis of the bankruptcy filing itself or because a pre-petition debt is owed. The disjunctive phrasing is, we think, significant. By such phrasing, it cannot be doubted that any refusal of requested utility services through the 20th day after the entry of an order for relief in bankruptcy is impermissible even if there is no discrimination on the part of the utility as long as the basis for termination of services was solely because of non-payment of a pre-petition debt.

The only cases which we could locate which have ever been decided under the Code in any jurisdiction that appear to touch on this point are the *Roberts* and *Kiriluk* cases in our district. The bankruptcy court decision in *Roberts* expressly rejects our above reading of § 366(a). However, the only reason presented by the court for so doing is that the legislative history makes no mention of any intention to require utilities to restore service which has been terminated pre-petition. 27 B.R. at 103–04, quoting H.R.REP. No. 595, 95th Cong., 1st Sess. 350 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 6306. On this basis alone, the court declines to read the term "refuse" as requiring a utility to re-store utility service which has been terminated pre-petition.

In its opinion affirming the bankruptcy court, the *Roberts* district court expressly declines to adopt the interpretation of the term "refuse" offered by the bankruptcy court. 29 B.R. at 810. Rather, that court focuses on the fact that the refusal to provide service was not based solely upon the debtor's failure to pay for pre-petition services, but also upon her failure to post a deposit with the utility which was required from all new customers of that utility who had a known unfavorable credit rating. The court expressly states that its holding is "a narrow one" which was "limited" strictly to a situation where a utility requires pre-service deposits from all customers with a known unfavorable credit rating.

In *Kiriluk*, Judge Fox carefully followed the reasoning of the district court in *Roberts*, although we detect some expressed doubts about same. Thus, the *Kiriluk* result is that cross motions for summary judgment are denied to both a debtor and a utility because it was unclear whether the utility's articulated policy of requiring deposits of new customers with an "unknown" or "unsatisfactory" credit history was in fact in place when the debtor sought restoration of service. 76 B.R. at 981, 984–85. Judge Fox does state that he feels that *Roberts* "was correctly decided," although he sees fit to bolster his argument with reference to, apparently, the same legislative history cited by Judge Goldhaber in his decision in *Roberts*. 76 B.R. at 983. Even at that, he states only that *Roberts* "*probably* is consistent with Congressional intent" (emphasis added). *Id.*

We do not believe that an interpretation of the term "refuse" can be avoided in this analysis, as the district court indicated in *Roberts*. There is no question that a refusal to provide service to a debtor solely because of non-payment of a pre-petition debt is proscribed by the statute. This prohibition cannot logically be explained away by arguing that the utility makes similar requirements from certain non-debtors. Whether requirements are made of non-debtors is relevant to the issue of dis-

crimination only, not the issue of whether the statute simply bars a utility from refusing services because of non-payment of a pre-petition debt at the outset of a bankruptcy. Moreover, the utility's implicit assumption that a debtor must always be treated the same as a party whose credit rating is unsatisfactory is effectively treating a debtor in a certain less-favored manner just because the customer is now a debtor. This is also proscribed by § 366(a).

Both Judge Fox and Judge Goldhaber recognize that an interpretation of the term "refuse" is necessary to resolve this issue. We agree. Where we disagree with them is in their implicit conclusion that whether § 366(a) proscribes a "refusal" to provide service to parties subject to pre-petition termination is ambiguous, such that legislative history must be invoked to interpret it. We believe that there is no ambiguity. *Refusal* to provide service because of non-payment of pre-petition bills is clearly and unconditionally prohibited.

The fact that Congress left no clear legislative history behind explaining what it had done in this regard cannot alter what it did in fact do by enacting § 366(a) in the form that it did. As we stated in *In re American International Airways, Inc., Begier v. United States of America, Internal Revenue Service*, 83 B.R. 324, 330–31 (Bankr.E.D.Pa.1988):

> Where a statute is plain on its face, it must be interpreted as it reads without resort to legislative history. *See, e.g., American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed. 2d 748 (1982); *Caminetti v. United States*, 242 U.S. 470, 485, 490, 37 S.Ct. 192, 194, 196, 61 L.Ed. 442 (1917); and *United States v. Pennsylvania Environmental Hearing Bd.*, 584 F.2d 1273, 1281 n. 26 (3d Cir.1978).

The foregoing principle has been recognized by courts interpreting an anomaly in the 1986 Bankruptcy Code amendments, whereby § 302(c) of the 1986 legislation, P.L. 99–554, prohibits the application of the amendments enacting Chapter 12 to pending cases, even though legislative history revealed an apparently clear intention of Congress to allow conversion of pending Chapter 11 and Chapter 13 cases to Chapter 12. In refusing a motion seeking to convert a pre-amendment Chapter 13 case to one under Chapter 12, Chief Judge Twardowski of this court, in *In re Reppert*, 84 B.R. 37, 39 (Bankr.E.D.Pa.1988), follows what he calls "the plain meaning role," i.e., "we may look beyond the plain words of a statute when the wording is ambiguous but caution that the ambiguity must be apparent from the statutory language itself." At 39. Thus, he concludes that a conversion of a pre–1986–amendment case to Chapter 12 is impermissible. *Accord, e.g., In re Carnahan*, 77 B.R. 207, 209–10 (Bankr.N.D. Ind.1987); and *In re Albertson*, 68 B.R. 1017, 1019–21 (Bankr.W.D.Mo.1987). *See also In re Ashhurst*, 80 B.R. 49, 51 (Bankr. E.D.Pa.1987); *In re Abdo*, 65 B.R. 56, 57–58 (Bankr.N.D.N.Y.1986); and *In re Cipa*, 11 B.R. 968, 970 (Bankr.W.D.Pa.1981).

We therefore conclude that the Debtor is correct in her argument that the Defendant must provide utility services to the Plaintiffs immediately upon notification of their bankruptcy filing. We do not consider this result as onerous to the Defendant. The number of Plaintiffs is not large. They include only parties termed for non-payment of pre-petition services, as opposed to other reasons. *Compare Hendrickson v. Philadelphia Gas Works*, 672 F.Supp. 823, 833–34 (E.D.Pa.1987) (no violation of § 366(a) occurs when a utility refuses to provide service because of unpaid claim in the nature of restitution due to debtor's meter-tampering and unauthorized usage). The mandate of § 366(a) prohibiting refusal of service unconditionally will have a duration of no more than twenty (20) days. In fact, in many cases, it will be less, because the Defendant cannot be said to "refuse" service unless same is requested by the debtor, and there could be a lag-time between the date of the order for relief and such a request. Moreover, the Plaintiffs are very likely to make arrangements to retain service before the expiration of the twenty (20)–day period in order

to retain service, as did the Debtor here. As we hold subsequently in this Opinion, at pages 944–46 *infra,* the onus is upon the debtor to make satisfactory arrangements within that period or, barring a court order to the contrary, face a new utility termination.

4. THE DEFENDANT'S POLICY OF REQUIRING AN ADEQUATE ASSURANCE PAYMENT FROM DEBTORS TO RESTORE SERVICES, WHEN IT DOES NOT REQUIRE ANY DEPOSIT FROM ANY NEW RESIDENTIAL CUSTOMERS NOR FROM SIMILARLY–SITUATED NON–DEBTORS, IS DISCRIMINATORY CONDUCT VIOLATIVE OF § 366(a).

■ Having concluded that a refusal to provide service to the Plaintiffs upon request is itself violative of § 366(a), we address the further question of whether the Defendant's practices, as to the Plaintiffs, are also discriminatory and, for that reason, violative of § 366(a) on an alternative basis. We thus consider the Debtor's second argument and we find that, given the Defendant's present policies, it is in fact discriminating against the Plaintiffs in refusing to provide post-petition service unless it first receives the full adequate assurance payment. This result is reached simply by applying the instant facts to the principles established in *Roberts* and *Kiriluk.*

First, the Defendant admittedly does not require security deposits from any residential customers as a condition for receipt of services, irrespective of the customers' unfavorable credit history. A policy of requiring deposits from residential customers with unfavorable credit histories was the sole basis upon which the district court in *Roberts* and this court in *Kiriluk* declined to rule in favor of the respective debtors. *Roberts* strongly suggested, 29 B.R. at 810, and *Kiriluk* expressly held, 76 B.R. at 984, that the lack of existence of such a policy would have justified a decision in favor of the respective debtors.

The Defendant's sole response to this argument is that PUC Regulations permit it to enact a policy of requiring security deposits from residential customers with unfavorable credit histories, but that it does not have such a policy, undoubtedly in a humane effort to provide services to all needy consumers. This observation reveals the irony of the *Roberts* and *Kiriluk* results: it benefits utilities whose actual policies are less attuned to public service than those of the Defendant, which we have always observed to make considerable efforts to accommodate indigent customers. The public interest of encouraging the more humane practices as those of the Defendant, relative to those of the utilities in issue in *Roberts* and *Kiriluk,* is another reason why we believe that our reasoning as to the first argument is sound.

Secondly, the Defendant admittedly allows less flexibility to debtors whose service has been terminated prior to filing than it does to non-debtors. An adequate assurance payment is *required* from the Plaintiffs, in full, before service will be reconnected. By comparison, no security deposit is required from non-debtors who seek to restore terminated service.

The Defendant argues that this treatment of debtors is not practically discriminatory, but is actually more accommodating to them, because non-debtors must pay their bills in full to re-acquire terminated utility service. Since the bills of customers who have been terminated are likely to be far larger than the amounts requested from debtors for adequate assurance payments, this argument has some surface appeal. However, the Defendant's policy, as described in the testimony of Mr. Bastian, recited in Finding of Fact 10, page 937 *supra,* is quite different from the policy of the Defendant as described in its Brief. As Mr. Bastian clearly stated, the Defendant does *not* require that bills predating termination be paid in full by non-debtors prior to restoration. Rather, the Defendant will restore service upon payment of a "small amount" if the customer lacks the ability to pay. An example of the flexibility accorded to non-debtors is the Defendant's immediate non-negotiated offer to restore the Debtor's service upon payment of $220.00 and to reduce even this demand to $170.00 upon the Debtor's *pro*

*se* and probably less than totally effective invocation of the PUC appeal process. The "small amount" may well be less than the adequate assurance payment. Certainly, a flexibility exists in the Defendant's policies as to non-debtors which is totally lacking in its rigid policies as to the Plaintiffs. Therefore, again because of policies which we believe are commendable and we must urge the Defendant to retain, the Defendant is chargeable with discrimination against the Plaintiffs when these are compared with its permissive policies as to non-debtor customers.

■ In so holding, we recognize that the language in § 366(a) proscribes only discrimination that, like a refusal to provide service, is "solely because" of a bankruptcy filing or a pre-petition debt. However, we believe that the terms "solely because" cannot be given too narrow of a reading. The same language, barring discrimination of benefits by a governmental unit "solely because" the debtor has filed bankruptcy or failed to satisfy a pre-petition debt, is contained in 11 U.S.C. § 525(a). In *Watts, supra,* 76 B.R. at 403–06; and *In re Metro Transportation, Inc.,* 64 B.R. 968, 975–76 (Bankr.E.D.Pa.1986), we indicated that, despite this language, claims of discrimination under § 525(a) should be decided like charges of discrimination in employment, housing, or public accommodations due to race, color, religion, sex, or national origin. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); and *Hankins v. Temple University,* 829 F.2d 437, 440–41 (3d Cir.1987). Since the Plaintiffs have made out a prima facie case that they are debtors, that her utility service had been terminated for pre-petition non-payment of services, and that the Defendant refuses to restore services post-petition on demand, we hold that the burden was placed upon the Defendant to establish a motivation different from non-payment of pre-petition bills as justification for its refusal to restore service. This burden is not impossible to meet. Utility service could be refused for some other purpose. *Compare Hendrickson* (discussed at pages 942–43 *supra* ). However, the Defendant has not undertaken to prove any motive other than non-payment of a pre-petition debt for not immediately restoring the Debtor's service, and the class definition was amended by us to include only parties whose service was terminated pre-petition for this reason. Therefore, we conclude that its actions were in fact discriminatory as to the Debtor, and in violation of § 366(a) on that basis also. Given our class definition, we conclude that the Defendant's policies discriminate against each member of the Plaintiffs' class.

**5. THE PLAINTIFFS ARE NOT ENTITLED TO CONTINUATION OF UTILITY SERVICE PAST THE INITIAL TWENTY (20) DAY PERIOD SET FORTH IN § 366(b) UNLESS THEY PROVIDE AN ADEQUATE ASSURANCE PAYMENT ACCEPTABLE TO THE DEFENDANT OR OBTAIN A PROTECTIVE COURT ORDER.**

■ The Debtor also argues that her service should have been restored immediately upon her counsel's offering to pay the adequate assurance payment in deferred installments under the terms of § 366(b). According to the Debtor, the self-executing nature of § 366(b), *see In re Penn Jersey Corp.,* 72 B.R. 981, 984 (Bankr.E.D.Pa. 1987), requires that a debtor merely "furnish adequate assurance" in the form of an offer of same and that, upon receipt of the offer and unless and until the utility obtains a court order that the offer is inadequate, it must provide service. We disagree that the language of § 366(b) can justify such an unlikely reading.

In *Penn Jersey,* 72 B.R. at 985–86, we implicitly rejected such a reading, by pointing out that a utility was only required to provide what could become gratuitous services for up to twenty (20) days, and that thereafter the debtor was subject to termination if it failed to satisfy the utility's terms. We assumed that, if the utility rejected the debtor's offer, it would be empowered to terminate service unless and until the debtor met its demands or obtained a protective court order enjoining a termination. This assumption was the ba-

sis for our conclusion, in *Penn Jersey*, that we should be flexible in determining what could constitute adequate protection of the utility's interests. Similarly, our conclusion here that § 366(a) requires a utility to provide service for no more than twenty (20) days presumes an interpretation of § 366(b) which would confine such an obligation upon the utility, without payment of what the utility deemed an *adequate* assurance payment, for that limited period.

We did not suggest anything to the contrary in *In re Allen*, 69 B.R. 867, 874 (Bankr.E.D.Pa.1987). There, we merely held that the 20–day period could not reasonably be interpreted as a closed-end period in which the debtor could retain service by payment of adequate assurance in the amount demanded by the utility post-petition. Therefore, upon payment of adequate assurance acceptable to the utility after the 20–day period had elapsed and service had terminated, the debtor there was held to be entitled to restoration of her electric service.

We also observe nothing in the principal authority cited by the Debtor on this point, *In re Tabor*, 46 B.R. 677 (Bankr.S.D.Ohio 1985), which suggests to the contrary. In that case, the court had developed a "superintendency rule" which required the debtor to deposit $75.00 to the trustee as adequate assurance of payment to any utility.[2] Nevertheless, a utility demanded a $600.00 adequate assurance payment from the debtor. The trustee responded by offering the utility the munificent sum of $1.00 as an adequate assurance payment. The court ultimately held the utility in contempt for demanding in excess of the established $75.00 figure. While not holding the trustee in contempt on a cross-motion because it deemed his conduct an "absurd aberration in carrying out his duties," 46 B.R. at 680, this disposition hardly condoned the trustee's conduct.

We do not agree that this decision in any way supports the Debtor's position. If the Debtor's position were correct, the court in *Tabor* would have complimented the ingenuity of the trustee rather than condemning his conduct and would have required the utility to obtain a court order that the $1.00 offer was insufficient in order to deny service. It did not do so. We shall not do so either.

The absurdity of placing the issue of when a utility must restore service at the mercy of the fertile mind of an attorney for a debtor is obvious. The offer of $1.00 as adequate security was a good enough example, but there would be no reason why a debtor's counsel would not attempt to offer even less. The Debtor's position could require the utility to refrain from terminating service even if the offer were a payment of but one ($.01) cent, or even if the offer were even something more elusive than any payment at all, like a plan provision assuring the utility an administrative expense status to which it would be entitled anyway, *see In re Gurst*, 76 B.R. 985, 990 (Bankr.E.D.Pa.1987), or an unenforcible *promise* to pay a certain sum at some time in the future.

We do not believe that § 366(b) can be read as the Debtor suggests in making this argument. We will not stretch the language of § 366(b) beyond its logical meaning, just as we refused to interpret § 366(a) to have a meaning different from its "plain meaning." *See* pages 941–42 *supra*. As we indicated at page 942 *supra*, our holding that the Plaintiffs are unconditionally entitled to service for twenty (20) days is partially dependent on the fact that the period for providing such service without the necessity for an adequate assurance payment is limited to twenty (20) days. Thus, our several holdings here are interrelated.

6. THE DEBTOR IS ENTITLED TO DAMAGES OF $20.00 ONLY; NO ATTORNEYS' FEES CAN BE AWARDED TO THE DEBTOR'S COUNSEL

 The Debtor requests the modest damages of $22.50 for purchasing candles and extra food due to her lack of electricity

---

**2.** We do not endorse the legality or propriety of any such rule. We have no such rule in this district.

between October 30, 1987, when she requested and was entitled to, but was nevertheless denied, restoration of service, and November 5, 1987, when the Defendant actually restored her electric service. It is doubtful that the Debtor provided solid proof of any actual damages. She testified that she purchased candles at a cost of $10.00 for the entire time that her electricity was off and spent $20.00 extra for food because of lack of electricity to operate her refrigerator, apparently also over the entire period of service termination.

In assessing these claims, it must be recalled that the Defendant legally terminated the Debtor's electric service on October 15, 1987. There is no evidence that the candles were not all purchased on or about October 15, 1987, and the Debtor testified to use of flashlights as well. It is similarly totally unclear whether the Debtor expended $20.00 extra on food over the entire period from October 15, 1987, through November 5, 1987, or over the crucial, shorter period that her service was terminated.

On the other hand, it is apparent to us that the loss of electricity for five (5) days entitled the Debtor to at least nominal damages. *Compare Carey v. Piphus*, 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978). We consider the $20.00 requested a nominal sum, and we shall award the Defendant this amount.

 The Debtor also requests an award of reasonable attorneys' fees to her counsel, Community Legal Services, Inc. We observe that her counsel arguably deserves an award for assisting such needy debtors obtain such a necessary commodity. A legal services organization is a particularly apt recipient of such an award, as it used scarce resources to prosecute this case with admirable tenacity and competence and would plow any award back into future services for other needy persons. However, we are forced to also observe that the

Debtor has recited no statutory basis for such an award. In the absence of such a statutory basis, we are not prepared to award same, as we are generally unwilling to allow attorneys' fees for services in bankruptcy court in deference the American Rule that a litigant may not generally tax an opponent for attorney's fees even if that litigant is successful in asserting a cause. *Cf. In re Nickleberry*, 76 B.R. 413, 425–26 (Bankr.E.D.Pa.1987).[3]

### E. CONCLUSION

An Order consistent with our foregoing Opinion will be entered.

### ORDER

AND NOW, this 6th day of April, 1988, after trial of February 3, 1988, on the merits of this proceeding and on the Plaintiff–Debtor's Motion for Class Certification therein, and upon consideration of the Briefs of the parties, it is hereby ORDERED AND DECREED as follows:

1. The Class Motion is GRANTED, and the Debtor is hereby allowed to maintain this action, pursuant to F.R.Civ.P. 23(b)(2), on behalf of all individual debtors who have had their residential electric service terminated solely for non-payment of past services by the Philadelphia Electric Company prior to filing bankruptcy in the past, or who may be so situated in the future (hereinafter the class members shall be referred to as "the Plaintiffs").

2. Judgment is entered in favor of the Plaintiffs as to Counts I and II of the Complaint and in favor of the Defendant as to Count IV in the Complaint.

3. It is declared that the Defendant's policy of refusing to supply electric service to the Plaintiffs upon request for same is violative of 11 U.S.C. § 366(a).

4. The Defendant shall take all actions necessary to comply with this Judgment

---

**3.** The Debtor seeks the relief described under headnotes D(3) and D(4) of this Opinion, pages 941–44 *supra*, in Counts I and II of her Complaint, respectively. Count IV of the Complaint recites the claim described in headnote D(5) of this Opinion, pages 944–45 *supra*. Count III of the Complaint stated a cause of action alleging a

violation of the Consent Decree in *In re Morris v. Philadelphia Electric Co.*, Bankr. No. 81–00901G, Adv. No. 81–0475G (Bankr.E.D.Pa. May 13, 1987). This Count was not addressed by the Debtor in her Brief, and we therefore presume that it has been abandoned by her.

and they are hereby enjoined from failing to do so as to the Plaintiffs.

5. The Debtor is awarded monetary damages of Twenty ($20.00) Dollars against the Defendant.

6. All other requests of the Debtor for monetary damages, attorney's fees, or other relief, are DENIED.